Nancy PACELLI, as Independent Administrator of the Estate of Huron Loyd Cain, Plaintiff–Appellant,

v.

Robert deVITO, et al, Defendants–Appellees.

No. 91–1086.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1991.

Decided Aug. 25, 1992.

Linda K. Stevens (argued), Deborah A. Golden, Robert H. Riley, Beth A. Stone, James R. McDaniel, Carol R. Prygrosky, Robert B. Foster, Schiff, Hardin & Waite, Chicago, Ill., for plaintiff-appellant.

Neil F. Hartigan, Atty. Gen., Gary E. Medler, Paul Millichap, Office of the Atty. Gen., Thomas C. Crooks (argued), Kalish & Colleagues, Jennifer A. Keller, Asst. Atty. Gen., Civ. Appeals Div., Patricia Borner, Janet A. Richmond, Debra J. Anderson, Katherine Novak, Donald R. Zoufal, Illinois Dept. of Corrections, Chicago, Ill., for defendants-appellees.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Huron Loyd Cain was trapped in a mental institution by two common features of bureaucracy: specialization and apathy. Although Cain was held 19 months after a psychiatrist concluded that he was no longer dangerous and ordered his discharge, each person he accuses has a plausible reply that he saw such a small portion of the picture that he cannot properly be called on to pay damages, and that his job description did not require him to learn more. Only one person knew the full truth: Cain himself, who was released promptly after he called the problem to the attention of a state court. Nancy Pacelli, Cain's sister and the administrator of his estate (he died in 1985), contends that the many defendants should have informed themselves. Because what state officials "should have known" is an insufficient basis of constitutional liability, *McGill v. Duckworth*, 944 F.2d 344 (7th Cir.1991), we agree with the district court that this deplorable indifference is not actionable under 42 U.S.C. § 1983.

I

Cain was sent to prison in 1971 under the Illinois Sexually Dangerous Persons Act, Ill.Rev.Stat. ch. 38 ¶ 105–8 (1969). He was confined at the Menard Correctional Center and moved to the Menard Psychiatric Center in 1974. This court held the Sexually Dangerous Persons Act unconstitutional because it employed a preponderance-of-the-evidence standard rather than the reasonable-doubt standard. *Stachulak v. Coughlin*, 369 F.Supp. 628 (N.D.Ill.1973), affirmed, 520 F.2d 931 (7th Cir.1975). While the district court's order in *Stachulak* was on appeal, Cain asked the Circuit Court of Cook County for discharge, asserting that custody was unconstitutional because the court committing him had used the preponderance standard. Judge Epton of the Circuit Court granted that request in part on May 9, 1975. Instead of releasing Cain outright, the court put Cain on "conditional release" under § 9 of the Act, a status equivalent to parole. Judge Epton's order reads:

IT IS HEREBY ORDERED that there is a finding that the defendant's [Cain's] and society's interests would best be served by committing the defendant as in need of mental treatment, Ill.Rev.Stat., ch. 91½. Accordingly, it is ordered that, subject to commitment of the defendant as in need of mental treatment, he appears to be no longer dangerous and is

conditionally released as a Sexually Dangerous Person, Ill.Rev.Stat., ch. 38, sec. 105–9, to the care of the Department of Mental Health. If committed as in need of mental treatment, he may not be released from the Department of Mental Health without a further order from this court.

The Department of Corrections (DOC) released Cain to the Department of Mental Health (now the Department of Mental Health and Developmental Disabilities, or DMHDD), which interpreted the "subject to commitment" and "[i]f committed" language in this order as calling for a civil commitment hearing. One was held before Judge Collins of the Circuit Court on May 19, 1975. Judge Collins, after finding Cain mentally ill and "in need of immediate hospitalization", committed him to the custody of the DMHDD.

The DMHDD held Cain at its Tinley Park Mental Health Center until the end of June 1976, when it sent him to another mental hospital at Manteno, Illinois. While Cain was at Tinley Park he obtained leaves, sometimes being allowed to join his relatives for as long as a week. Manteno was less accommodating; he had but a single home leave during the remainder of his stay, which was to last until April 1980. But the staff at Manteno began to question the need for his confinement. In January 1977 Cain's case worker suggested that preparations be made for discharging him to a nursing home. By September 1978 Cain's psychiatrist, Garth Smith, concluded that he was no longer in need of mental treatment; he drew up discharge papers in December 1978. These instructions were not followed, apparently because higher-ups in the DMHDD were not keen on releasing persons with a history of sexual abuse (recidivism would carry political repercussions) and because Maureen Mudron, a supervising attorney with the DMHDD, concluded back in 1975 that Cain *could not* be released on a finding that he was no longer in need of treatment. That finding would satisfy Judge Collins but not Judge Epton, whose order said that "[i]f committed as in need of mental treatment, [Cain] may not be released from the De-

partment of Mental Health without a further order from this court." Judge Collins's commitment order satisfied the "if" clause, so release seemed to depend on the Circuit Court's approval. John Posch, another attorney, found Mudron's memorandum and informed others about it in 1978 and 1979.

A note in the file of another of DMHDD's employees shows that Mudron believed that Judge Epton's continuing hold on Cain was improper and should be challenged. But it was not challenged— not by the DMHDD, anyway. It received two challenges from other sources. One was a class action designed to obtain the benefit of *Stachulak* for all persons who had been committed under the Sexually Dangerous Persons Act. In *United States ex rel. Morgan v. Sielaff*, No. 76 C 1562 (N.D.Ill.1976), the court issued a class writ of habeas corpus directing the respondents (who were officials of the DOC) to release "[e]ach member of the class who is presently on conditional release from confinement under Section 105–9 of the Illinois Sexually Dangerous Persons Act ... on May 31, 1977, unless by that date a new commitment hearing, wherein the standard of proof will be in accordance with [*Stachulak*] ... has been commenced."

The DOC, which knew about Judge Epton's order (but apparently not about Judge Collins's), informed the court that Cain was a member of the class. The court issued a conditional writ of habeas corpus in favor of Cain and 20 other persons. This document was delivered to Herbert Gentsch, the Records Supervisor at Menard. By the time Gentsch received the writ, Cain was at Manteno in the custody of the DMHDD, none of whose officials was a party to the class action. Gentsch could not release Cain from Menard (he wasn't there) or even from the custody of the DOC. So he did nothing, putting the writ in the files at Menard. Gentsch's lassitude was matched by that of the attorneys for the class, who did not follow up to see what happened to the persons they were representing vicariously. (Cain was not one of the named representatives of the class.) Because the

writ stayed in the file room at Menard, and Judge Grady, who issued it, did not publish an opinion explaining his action, the DMHDD's attorney Mudron did not know that Judge Collins's order really was the only one she need be concerned about, for Judge Epton's order had been nullified.

There were, as we said, two challenges. Cain raised the second. Represented by counsel, on February 22, 1980, he asked the Circuit Court of Cook County for release. Illinois had two lawyers at the hearing, held in April 1980. An assistant state's attorney told the court that Judge Epton's order "is ineffective" because superseded by Judge Collins's. Judge Brodkin suggested that a hearing was therefore unnecessary—that the DMHDD could release Cain without an order. Posch, representing the DMHDD, expressed greater concern about Judge Epton's order, and Judge Brodkin remarked: "It does cast a cloud on what rights they [officials of the DMHDD] have and what rights they don't have." Posch was worried that if Judge Brodkin concluded that the order was transparently defective or had lapsed, employees of the DMHDD might face liability. No one mentioned the writ of habeas corpus. The court took seven pages of testimony from Dr. Smith. Judge Brodkin immediately ordered Cain's release. Cain walked out a free man on April 17, 1980.

Posch was right to be worried. A year later Cain filed this suit, contending that the delay violated his rights under federal and state law. Posch found himself among the defendants. It took six years and five months for Cain's new lawyers to draft a complaint that satisfied them. By the time the fifth amended complaint was filed in September 1987, bringing the list of defendants to 11, Cain had been dead for almost three years. All of the defendants moved for summary judgment, which the district court granted in substantial measure. 1990 U.S. Dist. LEXIS 14824 (N.D.Ill.). The court reserved only the pendent claims under state law, writing that a plaintiff should not have to start in state court nine years after filing in federal court. Administrator Pacelli dismissed these state claims to make the judgment final. As things

reach us, then, Cain is asserting exclusively violations of the Constitution of the United States. (We refer to Cain and his estate alike as "Cain" for simplicity.)

## II

■ Cain believes that the defendants—not only the persons responsible for his day-to-day custody but also the directors of the DOC and the DMHDD and the lawyers who represented the agencies—violated his constitutional rights by disregarding the writ of habeas corpus. The district court held that although the writ canceled Judge Epton's "conditional release" order it did not affect Judge Collins's civil commitment order, which supported the DMHDD's custody. To Cain's riposte that after Dr. Smith issued discharge papers in 1978 only the Epton order authorized his detention, the district court replied that none of the defendants holding Cain at the DMHDD knew about the writ.

■ "They *should* have known!" is Cain's principal argument here. They should have known because state law required them to find out about such things (and required Gentsch to disseminate what he knew), and because a decent concern for the liberty of their fellow men requires no less. Yet there is a gulf between state law and the Constitution of the United States. Violations of state law are not actionable under § 1983. E.g., *Archie v. Racine*, 847 F.2d 1211, 1215–18 (7th Cir.1988) (in banc). The Constitution does not make public employees strictly, let alone vicariously, liable for injuries that befall their charges. Unless they know about the problem and intend that it continue, they violate neither the due process clause nor the cruel and unusual punishments clause. *Hudson v. McMillian*, — U.S. —, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Wilson v. Seiter*, — U.S. —, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Archie*, 847 F.2d at 1219–20. In other words, they must act because of, and not merely in

spite of, the objectionable consequence. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); cf. *Hernandez v. New York*, —— U.S. ——, ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion); *Steading v. Thompson*, 941 F.2d 498 (7th Cir.1991).

When the defendants moved for summary judgment, Cain had to produce evidence that someone knew of the writ and nonetheless decided to keep him in custody. He produced no such evidence. Instead he argued that they must be treated as knowing what they should have found out by being more diligent. A few cases, including *Wilks v. Young*, 897 F.2d 896 (7th Cir.1990); *Richardson v. Penfold*, 839 F.2d ,392, 395 (7th Cir.1988), treat what the actor should have known as equivalent to knowledge. Cain relies heavily on these opinions. This circuit abandoned their approach in *McGill*, 944 F.2d at 348–49, observing that equating actual and imputed knowledge is inconsistent with *Wilson* and other recent decisions of the Supreme Court. There is no evidence that anyone at the DMHDD knew that Cain was in custody in violation of a writ of habeas corpus, let alone that any of the defendants wanted illegal custody to continue. Even the lawyer who represented Cain in 1980 seems to have been unaware of the writ, and it would be odd to collect damages from state officials who are unlikely to know more about Cain's circumstances than Cain and his lawyers did.

■ A deeper problem afflicts Cain's theory. Section 1983 permits a court to redress violations of the Constitution, but a writ of habeas corpus is not itself the Constitution. It is just a judicial order—one based on the Constitution, to be sure, but standing apart from the Constitution. Disobedience to the writ is contempt of court, not an independent violation of the Constitution. Instead of waiting four years after Judge Grady issued the writ and filing a suit under § 1983, Cain should have attempted to enforce the writ by drawing it to the attention of the DMHDD and asking for Judge Grady's assistance if the DMHDD did not act appropriately. The lawyer representing this class of 21 persons should have ensured that the state complied. Regrettably the lawyer did not, exemplifying one of the problems of class actions. Vicarious representation is less effective than direct representation. Cain has had his own lawyers (at least three: one in 1975, one in 1980, and another who filed this suit in 1981, and there may have been more).

Gentsch was not representing Cain's interests and could hardly be expected to do so. Neither were Mudron and Posch. Attorney Mudron knew the most of any of the defendants. Although she did not know about the writ of habeas corpus, she knew about Judge Epton's order and thought it invalid, yet she neither asked the court to vacate the order nor instructed the DMHDD to disregard it. If Mudron had been Cain's lawyer, her quiescence would have been malpractice. She was the state's lawyer, however, not Cain's. Lawyers owe duties to their clients first and foremost. It does not violate the Constitution for a state to instruct its lawyers to look out after the state's interests—to be advocates rather than ombudsmen. Ours is an adversarial system. Cain knew about Judge Epton's order, indeed had procured the entry of that order in order to vindicate his rights under *Stachulak*. He was free to contest the limitations (he could have appealed or asked the court to reconsider) or seek the court's approval for his release (as he did in 1980).

■ Mudron and Posch were not entitled to mislead Cain or hinder his access to the courts, but they were not obliged to assist him. If it is not a separate violation of the Constitution to devise or defend a state practice later determined to offend constitutional norms, cf. *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1239–42 (7th Cir. 1990), after remand, 952 F.2d 965 (1992), it cannot be a violation to remain silent rather than informing the potential adversary that he should file such a suit. Confessing error on unconstitutional state laws and practices is admirable but not obligatory. How far a state's legal corps should be

advocates of governmental interests, and how far friends of the populace, is a question a state may resolve for itself. (It is interesting, for what it is worth, that Mudron thought Judge Epton's order questionable because it invaded the province of the DMHDD, not because it violated Cain's rights. Mudron believed that the Department should not be fettered by such judicial controls.)

One last observation. Illinois does not have a policy of ignoring writs of habeas corpus. To the contrary it enforces them and has regulations facilitating the process—as Cain points out in accusing Records Supervisor Gentsch of neglecting his duties under these regulations. What befell Cain is exceptional. The availability of state courts to redress random and unauthorized departures from ordinary procedures *is* due process of law. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Easter House v. Felder*, 910 F.2d 1387 (7th Cir.1990) (in banc). Although *Parratt* dealt with a deprivation of property, its principle is equally relevant to deprivations of liberty, including confinement in mental institutions. *Zinermon v. Burch*, 494 U.S. 113, 131–32, 110 S.Ct. 975, 986–87, 108 L.Ed.2d 100 (1990). We held in *Toney-El v. Franzen*, 777 F.2d 1224 (7th Cir.1985), that *Parratt* applies to a jailer's failure to compute a prisoner's term correctly and release him when lawful custody expires. Errors in deciding how long to maintain custody are regrettable but inevitable, and the best recourse is to apply to a court for decision. Judge Grady was available, as was the Circuit Court of Cook County, to which Cain eventually repaired—and from which he secured relief. Defendants did not rely on *Parratt* in the district court and so have forfeited its benefit, but future litigants should recognize that state courts are the first line of defense against snafus of the sort that ensnared Cain.

### III

■ What we have written about the writ of habeas corpus carries over to Cain's related argument that the DMHDD should have released him as soon as Dr. Smith decided that he was no longer in need of treatment. The district court granted summary judgment in favor of most defendants after finding that they had neither personal involvement nor knowledge of Cain's plight. The two lawyers, who knew the most, were trying to respect the Epton order and so acted without the mental state essential to liability under the Constitution, the court held.

Cain did not sue the persons responsible for his daily care and custody. Instead he sued Ella Curry, Claude Roush, and Jon Steinmetz, superintendents of Manteno during parts of his stay. He sued lawyers Mudron and Posch and two former directors of the DMHDD (Robert deVito and Leroy P. Levitt). For good measure Cain added Jack Saporta, superintendent of Tinley Park during his time there—although all of that time preceded both Dr. Smith's conclusion and the release date in the writ of habeas corpus. (Cain also sued Gentsch and two other employees of the DOC, who are irrelevant for these purposes.)

Of the eight defendants who worked in the DMHDD, the lawyers played the most significant part in the decision not to let Cain out after Dr. Smith's order ending the civil commitment. We have already explained why their role does not support an award of damages. The two directors of the DMHDD did not make case-by-case release decisions, and Cain does not contend that they promulgated any unconstitutional regulations. The four superintendents played a limited role in Cain's case. Steinmetz, as assistant superintendent of Manteno from 1969 through February 1980 (and acting superintendent for part of the time), reviewed Cain's file, found the Epton order, and asked Posch for advice about how to deal with the two judicial orders in conjunction with Dr. Smith's conclusion; Posch told him to respect the Epton order. The other three superintendents played no personal role; two left before Dr. Smith's order of 1978. Cain's theory is that all six of these administrators should have been more active—should have learned more and done more. Yet delegation is essential to bureaucracy; a decision to delegate does

not violate the Constitution, and there is no *other* decision for which Cain seeks to hold the six responsible under the Constitution. Some of these defendants may well be responsible under state law for particular delicts, but Illinois law has dropped out.[†]

■ Section 1983 does not create collective or vicarious responsibility. Supervisors are not liable for the errors of their subordinates. *Riordan v. Kempiners,* 831 F.2d 690, 695 (7th Cir.1987); *Soderbeck v. Burnett County,* 752 F.2d 285, 293 (7th Cir.1985). The "should have known" theory that Cain pursues is both legally deficient and inconsistent with the demands of effective administration. Department chiefs must be able to rely on psychiatrists and caseworkers to do the daily tasks, if they are to be performed at all. This implies not only ability to delegate but also ability to rely on the decisions of subordinates. Superintendents of mental hospitals cannot be personally liable for failing to anticipate medical findings, and thus the district court was correct in holding that, until Dr. Smith's decision late in 1978, there was no basis on which administrators should have questioned the propriety of his custody. They held Cain on the authority of two orders of a state court, and the Constitution does not demand that members of a state's executive branch refuse to follow orders of its judicial branch—at least not unless the orders are palpably illegal, which these were not. See *Turney v. O'Toole,* 898 F.2d 1470, 1472 (10th Cir. 1990); *Arensman v. Brown,* 430 F.2d 190, 194–95 (7th Cir.1970); *Kenney v. Fox,* 232 F.2d 288, 290 (6th Cir.1956); *Francis v. Lyman,* 216 F.2d 583 (1st Cir.1954). Cf. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

Instead of requiring everyone to know everything, a system of busybodies in which no one would be good at anything, a state may permit specialization and create a separate institution to deal with the inev-itable errors. That institution is the judiciary. Cain obtained relief promptly after drawing his problem to the attention of the Circuit Court of Cook County, and we are confident that he would have had fast relief had he turned to Judge Grady. Dawdling in seeking this aid meant delay in Cain's release, but a state whose courts are open need not insist that the head of a large bureaucracy master the details of each inmate's case.

### IV

■ According to Cain, his transfer from Tinley Park to Manteno in 1976 violated the due process clause because accomplished without hearings, and because Manteno was not the "least restrictive" confinement available in Illinois. Defendants reply that there is no evidence that Manteno was "more restrictive" than Tinley Park. True, Cain received fewer furloughs, but the record does not reveal why. The district judge did not decide whether the reduction in the number of home visits would be enough to create a dispute about a material issue. Instead he granted summary judgment on grounds of official immunity. As of 1976 there was no clearly established right to the "least restrictive" conditions. Indeed, there was no such right as of 1983, see *Johnson v. Brelje,* 701 F.2d 1201 (7th Cir.1983), and the district court reserved judgment on whether such a right is established today.

■ Cain was entitled to a hearing only if he had a liberty or property interest in remaining at Tinley Park. Ordinarily states may transfer their wards to any institution within the range authorized by the judgment of commitment. Compare *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), with *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). Only a legitimate claim of entitlement to a disposition contin-

---

[†] Although Cain dismissed the pendent state claims, his brief is replete with confusion between state and federal law. E.g.: "Moreover, even accepting the district court's finding [that Dr. Smith's discharge order was the first date on which other employees of the DMHDD knew that Cain no longer required treatment], the district court order does not address defendant Curry's liability for her failure to institute and enforce a policy, practice or procedure to insure periodic review of patients' records as required by § 10–2 of the Mental Health Code."

gent on the existence of particular facts creates the sort of interest that in turn requires the state to afford a hearing. Section 12–4 of the Mental Health Code in force in 1976 provided that "[t]he Department may transfer any patient from one state hospital to another whenever such transfer is deemed advisable." Ill.Rev. Stat. ch. 91½ ¶ 12–4 (1975). Such a grant of discretion negates any liberty or property interest and permits a transfer without hearing under *Meachum.* Cf. *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460–63, 109 S.Ct. 1904, 1908–11, 104 L.Ed.2d 506 (1989); *Wallace v. Robinson,* 940 F.2d 243 (7th Cir.1991) (in banc).

Section 12–4 went on to provide that the DMHDD "shall notify the patient or a responsible relative of such patient, in writing, at least 15 days before the proposed transfer ... [and if it receives an objection] shall immediately schedule a hearing to be held at the hospital or institution". In locating a liberty or property interest in these procedural rules, Cain slights *Olim v. Wakinekona,* 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1747–49, 75 L.Ed.2d 813 (1983), which holds that only *substantive* rules matter. The state supplies the substance, after which the Constitution specifies the minimum process.

Unless there is a form of pre-constitutional liberty interest in the "least restrictive" confinement, there is nothing requiring a hearing. Actually, there would be no right to a hearing even if Cain is correct—for if there is a substantive right to remain in the "least restrictive environment" then the state may not do otherwise, no matter how many hearings it holds. Let that pass. Cases such as *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), have been unwilling to deem such a requirement implicit in federal statutes, and it is equally hard to find support for the rule in cases construing the Constitution. Cain locates the requirement in *Covington v. Harris,* 419 F.2d 617 (D.C.Cir.1969), but *Covington,* worlds apart from Cain's to start with (it involved a transfer of a mental patient to a maximum-security "pavilion" equivalent to a prison rather than to a more secure men-

tal hospital), is in obvious tension with the Supreme Court's later holding in *Meachum.* We could not accept Cain's argument without overruling the conclusion of *Johnson v. Brelje* that no right to mental treatment in the "least restrictive environment" was established at all, let alone clearly established, as of 1983. 701 F.2d at 1210. Like the district court, we need not decide whether such a right has been established since. It was not recognized in 1976, and there is accordingly no foundation for an award of damages under the due process clause.

## V

Litigants must believe that judges spend an inordinate amount of time wringing their hands while informing persons who have been wronged that the courts will do nothing. This is not because judges like to make litigants feel bad—or themselves feel good by expressing sympathy—but because it is important to point out that the absence of a *particular* remedy (here, damages under § 1983) does not imply either the lack of a legal wrong or the absence of *all* remedy. Courts that are reluctant to order state officials to turn out their pockets years after the fact would have been eager to set things straight at the time, as Judge Brodkin did and Judge Grady would have done. Courts that are reluctant to treat the Constitution as a plastic document with a remedy for every wrong are willing to redress violations of more concrete rights established by state statutes and the rules of tort law, which courts mold in the light of experience. Cain began this suit under both state and federal law but abandoned the state claims. He chose unwisely. His real claims lie under state law. Damages suits are not the right way to reshape constitutional obligations of state officials. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

AFFIRMED.