James H. **KINDRED**, Plaintiff–Appellant,

v.

Jack R. **DUCKWORTH**, in his capacity as Superintendent of the Indiana Reformatory, et al., Defendants–Appellees.

No. 92–3803.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1993.

Decided Nov. 9, 1993.

Patrick Stern (argued), Indianapolis, IN, for plaintiff-appellant.

Kermit R. Hilles, David A. Arthur (argued), Dist. Attys. Gen., Office of the Atty. Gen., Federal Litigation, Indianapolis, IN, for defendants-appellees.

* The Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

1. Confidential correspondence is sealed correspondence between an inmate and attorneys, most government officials, courts, and representatives of the public news media. *See Bradberry,* Exh. B at ¶ B(1). So defined, confidential correspondence cuts a swath wider than that of "legal mail," a term of art evolving from the Supreme

Before EASTERBROOK and KANNE, Circuit Judges, and ENGEL, Senior Circuit Judge.*

ENGEL, Senior Circuit Judge.

The issue in this appeal is whether the Indiana Reformatory's recently-implemented policy of requiring inmates to open confidential correspondence in the presence of staff, as applied, comports with the terms of an earlier consent decree. The district court found the two compatible. We conclude they are not.

Having so concluded, we remand to the district court to determine whether subsequent legislation, applicable system-wide throughout Indiana and comporting with the standards of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), counsels that the consent decree has been effectively superseded by the statute and therefore should be vacated prospectively and its further enforcement denied.

## I. BACKGROUND

In 1976 a class action was filed by several inmates of the Indiana Reformatory at Pendleton attacking a number of perceived constitutional violations at that institution. The action was resolved when the trial court entered a consent decree covering "all persons who have been, are, and may be in the future confined to the Indiana Reformatory, Pendleton, Indiana." *Bradberry v. Phend,* No. IP 76–459–C, Consent Decree and Judgment (S.D.Ind. Mar. 21, 1977). The *Bradberry* decree effected a number of changes to the Reformatory's policies and procedures, including the way in which the institution should handle inmates' mail. Specifically, as to confidential correspondence,[1] the consent decree provided:

> Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Averhart v. Shuler,* 652 F.Supp. 1504, 1511 (N.D.Ind.), *aff'd,* 834 F.2d 173 (7th Cir.1987) (Table) ("All legal mail is confidential correspondence, but not all confidential correspondence is legal mail.").

Confidential correspondence shall not be opened, read, censored or copied, and its prompt delivery and transmission shall not be otherwise interfered with. However, should prison officials have reasonable grounds to believe that a piece of confidential correspondence may contain physical contraband (i.e., money, money orders, drugs, weapons) then and only then may a prison official, designated by the institution head, open such item of correspondence for the limited purpose of examining the contents for physical contraband, but only in the presence of the prisoner involved. In all such cases, such items of confidential correspondence shall be promptly handed over to said prisoner all without any reading, censoring, copying or further interfering with the deliverance or transmission of the item of correspondence. Once the item of correspondence has been transmitted to the prisoner, the item retains its confidential status and is not subject to confiscation, seizure, reading, copying, censoring or any other interference by prison officials.

*Bradberry,* Exh. B at ¶ B(3)(b).

In 1979, Indiana enacted a statute nearly identical to the above-quoted provision of the consent decree. *See* IND.CODE § 11–11–3–3 (Supp.1981), *amended by* Ind.Pub.L. 99–1986 (codified as amended at IND.CODE § 11–11–3–3 (Supp.1987)).[2] Some time after the statute's 1982 enactment, Jack Duckworth (Superintendent of the Indiana State Prison) implemented a policy whereby all incoming legal mail would be opened by prison staff in the presence of the recipient inmate for the purpose of detecting contraband. Duckworth undertook the measure in response to an increase of contraband entering the prison

under the guise of legal mail. This policy withstood scrutiny under both the Constitution and section 11–11–3–3. *See McChristion v. Duckworth,* 610 F.Supp. 791 (N.D.Ind. 1985), *aff'd in part and rev'd in part on other grounds,* 978 F.2d 1261, 1992 WL 311864, 1992 U.S.App. LEXIS 28198 (7th Cir. Oct. 21, 1992) (Table).

In 1989, Duckworth became the Pendleton Reformatory's Superintendent. Finding the same security concerns at the Reformatory as he had encountered at the prison, Duckworth instituted a policy in July 1992 under which inmates were required to open all incoming legal mail in the presence of Reformatory staff. Inmate James Kindred responded to the new policy by moving the trial judge to hold an immediate hearing, to enforce the consent decree, and to hold Duckworth and other Indiana corrections officials in contempt.[3]

Specifically, Kindred alleged that Reformatory staff, in violation of the consent decree, had opened two pieces of legal mail in his presence after he had refused to open the letters in the staff member's view. According to Kindred's affidavit, a Reformatory counsellor brought an envelope to Kindred's cell bearing the return address of an Indiana law firm. Kindred declined the counsellor's request to open the envelope because the counsellor was unable to articulate reasonable grounds as to why that envelope might contain contraband. The counsellor then returned the unopened envelope to the mail room. Undaunted, and apparently fortified by instructions from his superiors, the counsellor returned to Kindred's cell the next day with the original envelope and one addressed from the United States District Court. The counsellor purportedly informed Kindred

---

2. Section 11–11–3–3, before an amendment in 1986 provided:

If correspondence is to or from government officials, courts, attorneys, or representatives of the public news media, it may not be opened, read, censored, copied, or otherwise interfered with in regard to its prompt delivery or transmission. However, if the department has reasonable grounds to believe that a piece of correspondence may contain contraband or prohibited property, the department may open it in the presence of the confined person for the purpose of examining the contents for con-

traband or prohibited property. Upon conclusion of the inspection, the item of correspondence must be promptly delivered or transmitted without reading, censoring, copying, or further interfering with its deliverance or transmission.

3. Kindred also asked the district court to incarcerate certain defendants, to levy $60,000 in fines ($50,000 of which was to be earmarked for the federal government), to appoint a master to ensure future compliance with the consent decree, and to award costs and attorneys fees.

that he had been told to open the envelopes, look into them, and then deliver the contents to Kindred. The counsellor then proceeded to comply with his instructions.

Without holding the requested evidentiary hearing, the district court denied Kindred's motion for contempt and other relief. The crux of the trial judge's reasoning is contained in the following excerpt from an entry that accompanied the court's order:

> Mr. Kindred's motion must fail. Bradberry deals with procedures. It does not, and could not, establish, define or modify substantive constitutional standards dealing with the opening of confidential mail or anything else. *Pacelli v. DeVito*, 972 F.2d 871 (7th Cir.1992). That, simply, is the end of things. It would be aberrant for the plaintiff class to contend or for this Court to rule that the State of Indiana was compelled by a federal decree to accord its prisoners treatment which is not compelled by the constitution, for on what grounds could such a decree possibly be based? The movants do not, here at least, challenge the new policy on constitutional grounds, hence their motion for a finding of contempt and other relief must in all respects be **denied**.

*Bradberry v. Duckworth*, No. IP 76–459–C, Entry Denying Motion for Contempt Order and Other Relief at 2–3 (S.D.Ind. Oct. 27, 1992) (footnotes omitted, emphasis in original). Kindred's timely notice of appeal followed.

## II. DISCUSSION

█ A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in and be enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees.

*Rufo v. Inmates of Suffolk County Jail*, —— U.S. ——, ——, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992). When, as here, a consent decree leads to contempt proceedings, we will leave undisturbed the trial court's ruling ordering or denying contempt absent clear error or abuse of discretion. *See Walaschek & Associates, Inc. v. Crow*, 733 F.2d 51, 53 (7th Cir.1984). In addition, we are mindful of the special deference owed to trial judges who have had years of experience with a particular matter. *See Hutto v. Finney*, 437 U.S. 678, 688, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978); *Rufo*, —— U.S. at ——, 112 S.Ct. at 765 (O'Connor, J., concurring). Our limited review notwithstanding, we are unable to agree with the district court's conclusion that Duckworth's policy, as it has been applied, does no violence to the consent decree.

█ The district court's entry is subject to several interpretations. One reading suggests a belief that consent decrees, at least those stemming from constitutional grievances, cannot impose upon the parties rights and obligations greater than those required by the Constitution.[4] This view quite simply is incorrect. Consent decrees often embody outcomes that reach beyond basic constitutional protections. *See Rufo*, —— U.S. at ——, 112 S.Ct. at 762 ("we have no doubt that, to save themselves the time, expense, and inevitable risk of litigation ... petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires ..."); *see also Langton v. Johnston*, 928 F.2d 1206, 1217–18 (1st Cir.1991). Indeed, it is a rare case when a consent decree establishes only the bare minimum required by the Constitution. Often, it is precisely because parties are unsure of the current posture of the law that they are willing to compromise their positions. *See Rufo*, —— U.S. at ——, 112 S.Ct. at 762–63 (quoting from *Plyler v. Evatt*, 924 F.2d 1321, 1327 (4th Cir.1991) (such de-

---

4. Wisely, Kindred has refrained from challenging the constitutionality of Duckworth's policy. *See Wolff v. McDonnell*, 418 U.S. 539, 577, 94 S.Ct. 2963, 2985, 41 L.Ed.2d 935 (1974) ("The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely war-

rants prison officials' opening the letters.... [B]y acceding to a rule whereby the inmate is present when mail from attorneys is inspected, [prison officials] have done all, and perhaps even more, than the Constitution requires.").

crees "would make necessary ... a constitutional decision every time an effort was made either to enforce or modify the decree by judicial action")).[5]

■ A second interpretation of the district court's entry is that the decree merely established procedural mechanisms for complying with substantive constitutional rights. This analysis assumes that judgments here actually contemplated the constitutional floor as providing the only level of protection. Because the substance of constitutional rights changes over time, or so the argument goes, so should the procedures used to implement those rights. We find this position flawed for at least two reasons.

First, the decree sets forth more than simple procedural obligations; it has endowed Reformatory inmates with the substantive right to receive incoming confidential mail without interference unless reasonable grounds exist to believe that contraband is contained within the mail's packaging. The consent decree has clothed this right with certain procedural safeguards. Such fortification, however, does nothing to detract from the substantiality of the specific right conferred.[6]

Second and more important, the text of the decree provides no support for the proposition that its terms are tied to minimal constitutional safeguards. If the parties had intended to draft such a document, one would expect either express language to that effect or, at least, terms which encompass the barest of then-extant constitutional rights. Neither circumstance exists here. First, the decree contains no express manifestation of an intent to track constitutional development. Second, as the above-quoted portion from the Supreme Court's 1974 decision in *Wolff* indicates, *see supra* note 4, the Reformatory was

under no constitutional compulsion in 1977 to subscribe to the terms of the *Bradberry* decree. Indeed, Indiana prison officials would have been within their constitutional prerogatives to have staff open all incoming inmate mail—confidential or otherwise—even in the absence of articulable cause. This court and others, invoking *Wolff,* consistently have upheld policies similar to Duckworth's. *See, e.g., Gaines v. Lane,* 790 F.2d 1299, 1305–06 (7th Cir.1986) (upholding Illinois Department of Corrections regulation). The difference between those cases and this one is that Duckworth's predecessor bargained away Duckworth's ability to implement his desired policy. Accordingly, we cannot accept the district court's "procedures only" interpretation of the consent decree.

■ The logic of the trial court's interpretation, therefore, provides an insufficient basis for affirmance. Here, Duckworth argues that, given the relative ease with which contraband can be smuggled into the Reformatory under the guise of confidential correspondence, he has "reasonable grounds" to believe that physical contraband may be found in every piece of incoming mail. In support of his position, Duckworth notes that the decree neither defines "reasonable grounds" nor specifically requires that those grounds be individualized. While Duckworth's premises are correct, his conclusion is only marginally tenable. By its terms, the consent decree prohibits the opening of confidential mail unless "prison officials have reasonable grounds to believe that a piece of confidential correspondence" contains contraband (emphasis added). This wording so obviously contemplates some sort of particularized suspicion that we cannot believe Duckworth seriously asserts a contrary position. *See White v. Roughton,* 689 F.2d 118, 119 (7th Cir.1982) ("[T]he relevant purposes

---

5. For a collection of scholarly works on consent decrees and their underlying motivations, *see* U.Chi. Legal F., *Consent Decrees: Practical Problems and Legal Dilemmas* (1987).

6. The district court's reliance upon our earlier decision in *Pacelli v. Devito,* 972 F.2d 871 (7th Cir.1992) is misplaced. *Pacelli* involved a former mental patient who brought a section 1983 action against various state mental health officials for failing to make themselves aware of a

writ of *habeas corpus* ordering his release from confinement. As egregious as the facts of that case were, we were obliged to reject the plaintiff's claim for relief because disobedience of a writ of *habeas corpus* is a contempt of court violation, not an independent constitutional violation. *Id.* at 876. Unlike the plaintiff in *Pacelli,* Kindred does not allege a violation of the Constitution. Rather, he alleges a violation of the judicially-enforceable consent decree.

in interpreting a consent decree (like any other contract) are the purposes embodied in the instrument rather than the maximum aspirations—which are bound to be inconsistent anyway—of the interested parties.").

But, Duckworth continues, the district court in *McChristion* accepted his broad reading of "reasonable grounds" when upholding his earlier prison policy in the face of statutory language nearly identical to that of the consent decree. *See* 610 F.Supp. at 793–96.[7] However, the continued viability of *McChristion* would seem to have been undercut by Indiana's legislature. As indicated earlier, the state amended section 11–11–3–3 in 1986 while the *McChristion* litigation was pending, the major modification involving deletion of the words "if the department has reasonable grounds to believe that a piece of correspondence may contain contraband or prohibited property" from the statute. *See* Ind.Pub.L. 99–1986 (codified as amended at IND.CODE § 11–11–3–3 (Supp.1987)). While this amendment may have prejudiced Indiana inmates incarcerated at institutions other than the Reformatory, they were left with no viable statutory or constitutional basis upon which to complain.[8]

■ This would be a different and much closer case if Duckworth had implemented the policy in response to some real or perceived crisis at the Reformatory. The Constitution does not require jailers to behave during emergencies the same way it requires them to behave in less stressful times. *See, e.g., Hughes v. Rowe,* 449 U.S. 5, 11, 101 S.Ct. 173, 177, 66 L.Ed.2d 163 (1980) (citing *Hayes v. Walker,* 555 F.2d 625, 633 (7th Cir.1977)); *Wilson v. Attaway,* 757 F.2d 1227, 1241 (11th Cir.1985). This principle would seem to apply with equal, if not more, force in the context of a consent decree violation. *See Wilson,* 757 F.2d at 1240–41.

Here, however, Duckworth neither makes, nor could he make, such a claim. Duckworth had been the Reformatory's Superintendent for approximately three years before he decided to initiate the policy. By this time, the Reformatory had been operating under the dictates of the *Bradberry* decree for over fifteen years. Nothing in Duckworth's affidavit in response to Kindred's motion suggests that crisis-level conditions at the Reformatory warranted a sudden change in policy.

With some help from the court at oral argument, Duckworth was able to articulate a final possible textual basis for affirming the district court's decision. Read literally, the decree prevents Reformatory staff from opening, reading, censoring, copying or otherwise interfering with incoming confidential correspondence. Thus, it is the inmate's right, absent reasonable grounds to suspect contraband, to open confidential correspondence. Duckworth's policy, he believes, does not abrogate this right because the inmate is still the person opening the mail—he simply must now do so in the presence of Reformatory staff.

Under this interpretation of the decree, the actions taken would still be violative of its terms. On the record here, Kindred refused to open the envelope in the presence of staff. Duckworth's policy, as explained in his affidavit, offers no solutions to such a stalemate. Not surprisingly, therefore, when the Reformatory counsellor was faced with the recalcitrant Kindred, the counsellor obtained some counsel of his own. Reformatory officials had several options at their disposal. They could have directed the counsellor to return the mail to its sender, hold the correspondence in the mail room, destroy the mail, or—as the Reformatory decided—open the confidential correspondence in the inmate's

---

7. *McChristion* also held that section 11–11–3–3 did not create a constitutionally cognizable liberty interest. 610 F.Supp. at 793–94. Of course, such a determination—even if it were binding upon this court—would have little bearing upon this case because Kindred claims a right deriving from a negotiated consent decree rather than from a statute or constitution.

8. Mr. McChristion himself appears to have comprehended the import of the legislature's actions.

Rather than attempting to appeal that aspect of the district court's opinion, *see McChristion v. Duckworth,* 978 F.2d 1261, 1992 WL 311864, 1992 U.S.App. LEXIS 28198 (7th Cir. Oct. 21, 1992) (Table), McChriston appears to have recast his legal mail claims in constitutional terms. *See McChristion v. Duckworth,* Civil No. S79–17, 1991 WL 318718, 1991 U.S.Dist. LEXIS 19452 at *59–65 (S.D.Ind. Apr. 23, 1991) (Magistrate's Report and Recommendation).

presence. By choosing the latter result, Duckworth can no longer rely upon his textual compliance argument, because the inmate is not the person who opened the mail. Accordingly, Duckworth's policy, as he has chosen to apply it, violates both the spirit and the letter of the consent decree.

■ Our analysis begs one final question: What should Duckworth have done in order to implement a policy that is both reasonable and constitutional? The answer is to be found in Federal Rule of Civil Procedure 60:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

Fed.R.Civ.P. 60(b)(5). As the above quoted portion of the Supreme Court's recent opinion in *Rufo* indicates, consent decrees are subject to the same rules applicable to other judgments. Thus, Duckworth should have moved the district court to either vacate or modify the *Bradberry* decree.[9]

Having so found, we are loath to hold that desuetude alone negates an otherwise valid consent decree. A consent decree is a valuable tool in the effective enforcement of civil rights law. It permits flexibility in adapting a judicial order to the particular needs of the case at hand. That all interested parties have a hand in its formation leads to a greater degree of cooperation and reduces the inevitable friction that accompanies litigation. It permits imaginative and hence often more effective solutions to practical problems. It is economical of the court's time and of the parties' pocketbook. A continuing respect for the valid decrees of a court commands that they be obeyed until changed. *See Pasadena v. Spangler,* 427 U.S. 424, 439–40, 96 S.Ct. 2697, 2706–07, 49 L.Ed.2d 599 (1976); *see also Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). At the same time it does not necessarily follow that the whole gamut of potential relief must inevitably follow.

■ Sixteen years have passed since entry of the consent decree. Meanwhile, the Indiana legislature has twice since then amended its statutes to comport with the constitutional mandates of *Wolff* with respect to inmate mail. The Supreme Court has counselled that civil rights relief that intrudes into areas of primary state concern should not go on forever but should be terminated whenever the constitutional objective has been achieved.[10] Whatever may be the life expectancy of federal consent decrees, respect for the principle of separation of powers suggests that decrees imposing obligations upon state institutions normally should be enforceable no longer than the need for them.

It is possible, though not evident from the limited record before us, that there may be some lingering effect of the circumstances that occasioned the decree in the first place. These circumstances might apply uniquely to this institution, notwithstanding the events that have transpired since its entry, and they might render continued enforcement of the existing decree necessary. This, however, is a matter for resolution by the district court

---

9. *See* Michael J. Feiweger, Note, *Consent Decrees in Prison and Jail Reform—Relaxed Standard of Review for Government Motions to Modify Consent Decrees,* 83 J. Crim.L. & Criminology 1024 (1993).

10. With respect to school desegregation, Justice Kennedy has observed:

> ... the court's end purpose must be to remedy the violation and to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.

*Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1445, 118 L.Ed.2d 108 (1992) (citing *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977)). And, appropriate here, "a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right." *Id.* —— U.S. at ——, 112 S.Ct. at 1442–43 (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–1276, 28 L.Ed.2d 554 (1971)); *see also Board of Educ. of Okla. City Pub. Sch. v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991).

which entered it. *See Pasadena v. Spangler,* 427 U.S. at 441, 96 S.Ct. at 2707.

REVERSED and REMANDED for further proceedings consistent herewith.