# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-1964

J.H. AND J.D., by and through,
their father, TODD HIGGIN,

*Plaintiffs-Appellants*,

*v.*

GORDON JOHNSON, GARY T. MORGAN,
AMY REMINGTON, LYNN CROWTHER,
MICHAEL HORSTMAN, INA DENTON,
GLORIA LEWIS, AND LUIS SOTO,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 95 C 2822—**John W. Darrah**, *Judge.*

_____

ARGUED SEPTEMBER 4, 2003—DECIDED OCTOBER 10, 2003

_____


Before FLAUM, *Chief Judge*, and EASTERBROOK and
MANION, *Circuit Judges*.

FLAUM, *Chief Judge*. J.H. and J.D., minor siblings, were
sexually abused by their respective foster fathers in foster
homes selected for them by Ada S. McKinley Community
Services, Inc. ("McKinley"), a licensed private child wel-
fare agency under contract with the Illinois Department
of Children and Family Services ("DCFS"). After the abuse

came to light, the foster fathers, Richard Hill and William White, were both convicted of aggravated sexual assault. The case before us today is about the responsibility of various DCFS employees for the placement of J.H. and J.D. in the two homes in which they were abused. J.H. and J.D.'s father, Todd Higgin ("Higgin"), has brought this 42 U.S.C. § 1983 claim on their behalf against Gordon Johnson, Gary T. Morgan, Amy Remington, Lynn Crowther, Michael Horstman, Ina Denton, Gloria Lewis, and Luis Soto for allegedly violating their constitutional right to be free from placement in a foster home where the state knew or suspected that abuse was likely to occur. The district court granted the defendants' motion for summary judgment. For the reasons stated herein, we affirm.

## I. Background

When J.H. was four years old and her brother, J.D., was three years old, they entered the custody of DCFS as neglected minors after a juvenile court determined that their mother was unfit to care for them. Beginning in January 1988 and continuing through January 1990, the two children lived separately in several different foster homes supervised by either DCFS or McKinley.

Relevant to the claims in this case, J.H. lived in the McKinley home of Mr. and Mrs. White from February 3 to October 20, 1989, and J.D. lived in the McKinley home of Mr. and Mrs. Hill from March 15 to December 15 of that same year. It is undisputed that both J.H. and J.D. were sexually abused by Mr. White and Mr. Hill, respectively. Although neither child reported any sexual contact at the time it occurred, the abuse was discovered once they were returned to the care of their natural father, Higgin. While in Higgin's care, his girlfriend saw J.H. perform a sexual act on J.D. J.H. admitted that she learned the behavior from Mr. White. This led to the discovery that J.H. and J.D.

had each been sexually abused in their respective foster homes. While investigating the molestations, it was revealed that Mr. Hill had been accused of sexually abusing two other foster children in 1980 and 1984, although subsequent DCFS investigations concluded that those allegations were unfounded.

During the time period when J.H. and J.D. were living in the White and Hill homes, McKinley was a licensed private child welfare agency under contract with DCFS to arrange specialized foster care to children under DCFS guardianship. With respect to McKinley homes, DCFS maintained essentially a monitoring role while McKinley's own staff had responsibility for basic operations, including: finding potential foster families; conducting initial studies to determine if families were fit to become foster parents; placing children in individual McKinley homes; and providing direct caseworker services to children, such as making personal home visits and supervising their progress. Each McKinley child was also assigned a DCFS caseworker who would monitor the services provided for the child through the agency's reports and other records, although the DCFS caseworker would not generally visit the child.

The eight defendants named in this suit held various positions at DCFS during the time period at issue. The following five defendants held managerial and supervisory positions within DCFS: Gordon Johnson was DCFS's Director; Michael Horstman was DCFS's Executive Deputy Director; Gary Morgan was DCFS's Guardianship Administrator; Ina Denton was Deputy Director of DCFS's Cook County Division; and Gloria Lewis was DCFS's Associate Deputy Director for the Cook County Division. None of these five defendants personally handled any casework functions for children in DCFS homes or child welfare agency homes or directly handled any licensing functions for such homes.

Defendant Amy Remington-Flem ("Remington") was a DCFS caseworker assigned to J.H.'s and J.D.'s cases when they were originally placed under DCFS guardianship in January 1988 until September 15, 1988. Gloria Hunt, who is not a defendant in this case, took over this assignment from Remington. Defendant Lynn Crowther ("Crowther") was J.H. and J.D.'s caseworker from June 6, 1989 until August 1, 1990. Defendant Luis Soto ("Soto") supervised Remington and Crowther. In line with DCFS's practice with respect to private agency foster homes, Remington and Crowther did not provide in-person caseworker services for J.H. and J.D. while they were in the White and Hill homes, but rather monitored the casework services provided to them by reviewing McKinley staff reports.

In early 1989, DCFS commenced a licensing investigation of McKinley based on reports that McKinley was receiving "kick backs" from its foster parents. Reports produced by this investigation reflected a wide variety of concerns with McKinley homes, including, for example, the use of corporal punishment; clutter and filth; and inadequate medical and other records. For the White home, the licensing investigation records reported that the household exceeded the licensed capacity by one child, cleaning supplies were accessible to children, and Mr. White had not furnished requested documentation reflecting counseling he supposedly received after a nervous breakdown a few years earlier. The Hill's report found that the household exceeded the maximum number of children permitted, there were no inoculation papers for their dog, and a medical exam for one of the foster children in their care was missing.

The results of the investigation into McKinley led DCFS to give notice to McKinley that is was cancelling its contract for services. McKinley filed a lawsuit seeking to enjoin DCFS from taking any action against McKinley's contract, including removing children from McKinley foster homes. As the dispute between McKinley and DCFS

ensued, a number of McKinley foster families, including the Hill home but not the White home, transferred to DCFS supervision. Remington visited the White home in October 1989 for the purpose of preparing a foster placement assessment and recommended that J.H. be removed from the home due to behavioral problems. Shortly thereafter, J.H. was relocated to another foster home. In December, three days after a hotline report that Mr. Hill had sexually abused female foster children in his home, J.D. was removed from the Hill home and placed in a DCFS emergency shelter. Both children were eventually returned to Higgin's custody.

## II. Discussion

We review a district court's grant of summary judgment *de novo*. *Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001). Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Tesch v. County of Green Lake*, 157 F.3d 465, 471 (7th Cir. 1998). Therefore we must examine the plaintiffs' allegations to see whether the facts, construed in the light most favorable to them, establish an actionable claim under § 1983. To succeed on such a claim, a plaintiff must show that: (1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996). The second requirement is not an issue in this case as all parties agree that defendants were acting under color of state law.

As to the first requirement, the plaintiffs claim that the DCFS employees violated their due process rights under the Fourteenth Amendment. Though the state usually does not have a constitutional duty to protect private citizens from doing harm to each other, *see DeShaney v. Winnebago*

*County Dept. of Soc. Servs.*, 489 U.S. 189, 202, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1988), we have recognized that children in state custody have a constitutional right not to be placed in a foster home where the state knows or suspects that the children may be subject to sexual or other abuse. *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990); *Lewis v. Anderson*, 308 F.3d 768 (7th Cir. 2002) (finding that right arises under "state-created danger" and "special relationship" exception to the general rule).

Thus, to prevail on a § 1983 claim based on this right, the plaintiffs must not only prove their injuries but must also prove that the state actors knew of or suspected the specific risk facing plaintiffs and consciously ignored it or failed to stop the abuse once it was discovered. *Lewis*, 308 F.3d at 773 ("In order to survive summary judgment [on a § 1983 claim], the plaintiffs needed to put forth a case that the [state's department of health and social services] defendants actually knew of or suspected the existence of child abuse in the prospective adoptive family."). By incorporating a modified deliberate indifference standard (i.e., requiring actual knowledge *or suspicion* of the alleged risk), the right set forth in *K.H.* and *Lewis* aligns itself with Supreme Court decisions and other cases from this circuit dealing with state actors failing to prevent harm to those whom they have a duty to protect. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 104-06, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (applying the "deliberate indifference" standard to evaluate decisions regarding the medical needs of prisoners); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 1674, 143 L. Ed. 2d 839 (1999) (applying "deliberate indifference" standard to school officials' response to student-on-student sexual harassment); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (holding that the test for deliberate indifference is subjective and prison officials will only be liable if they act or fail to act despite knowledge of a substantial risk of serious harm). "Deliberate indifference" is found

where an actor responds unreasonably to a substantial and known risk rather than to a risk of which the actor merely should have known. *See Farmer v. Brennan*, 511 U.S. 825, 836-39, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (equating "deliberate indifference" with subjective recklessness). The standard set forth in *K.H.* and *Lewis* differs from the "deliberate indifference" standard only in the sense that it can be satisfied by proof of a state actor's knowledge *or suspicion* of the risk of harm, rather than just knowledge. Both standards are subjective. Though we have described the burden of proof for plaintiffs asserting § 1983 claims against state child welfare employees as "stringent" and acknowledged that often the underlying facts of cases like this "portray a sad course of events," we nevertheless continue to require plaintiffs to demonstrate that the individual defendants had specific "knowledge or suspicion" of the risk of sexual abuse facing the children in order to hold defendants liable under § 1983. *Lewis*, 308 F.3d at 773.

The plaintiffs vigorously argue that the appropriate standard for analyzing this case is the "professional judgment" standard as articulated in *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d. 28 (1982) (holding that decisions regarding the safety training of involuntarily committed mentally retarded persons made by a professional can be the basis for § 1983 liability only when the decision substantially departed from accepted professional judgment). Employing this standard would amount to us overruling our decisions in *K.H.* and *Lewis*. As *K.H.* made clear, a professional judgment exercised by a child welfare worker serves as a "secure haven from liability" rather than the starting point for determining liability. *K.H.*, 914 F. 2d at 854. ("Only if without justification based either on financial constraints or on considerations of professional judgment [child welfare workers] place the child in hands they know to be dangerous or otherwise unfit do they expose themselves to liability in damages."). A bonafide profes-

sional judgment may shield the state's caseworkers and supervisors who acted despite knowledge of a risky placement from liability, but whether such a professional judgment was exercised is not the threshold determination. Knowledge or suspicion that a foster parent is a probable child abuser remains the legal yardstick for measuring the culpability of state actors in § 1983 cases like this one.

Moreover, in order to recover damages against a state actor under § 1983, a plaintiff must show the actor was "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002) (citing *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)). This limitation mandates that a supervisor can be held liable under § 1983 only if he or she "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Doyle*, 305 F.3d at 614 (citing *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).

In this case, the plaintiffs essentially argue that the defendants "knew" of the risk of sexual abuse to J.D. and J.H. because it was the defendants' responsibility to know. In particular, the plaintiffs assert that because Illinois state law requires foster homes, even those supervised by private agencies, as the White and Hill homes were in this case, to be licensed and does not permit DCFS employees to delegate their essential supervisory responsibilities, the defendants must be liable for the plaintiffs' injuries. The plaintiffs' brief describes at length the statutory duties Illinois law imposes on various DCFS workers. However, we find that the plaintiffs' theory of statutorily-imposed knowledge falls short of satisfying their burden of proof.

First, a violation of state law—even assuming one occurred in this case—does not *per se* make a state actor liable under § 1983. State law violations do not form the basis for imposing § 1983 liability. *See, e.g., Windle v. City*

*of Marion, Ind.*, 321 F.3d 658, 662-63 (7th Cir. 2003); *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) ("It is therefore a truism, reiterated many times by this court, that mere allegations of state law infraction are insufficient to support a Section 1983 claim."). While a DCFS employee's dereliction of statutory duties should be of concern to Cook County and the State of Illinois, they do not form the basis of a § 1983 claim. *See Estate of Novack v. County of Wood*, 226 F.3d 525, 531-32 (7th Cir. 2000).

Second, knowledge or suspicion of abuse cannot merely be imputed from a statute. Rather, the plaintiffs need to put forth a case that the DCFS employees actually knew of or suspected the existence of child abuse in the White and Hill foster homes. *See Lewis*, 308 F.3d at 773. Under these circumstances, constructive or statutorily-implied knowledge cannot serve as a substitute for actual knowledge or suspicion. Even if state regulations do fix personal responsibility for children in the custody and guardianship of DCFS with DCFS employees, the regulations themselves provide no evidence that any individual defendant had any actual knowledge or suspicion of the problems occurring in these particular households.

In addition, the plaintiffs must show a connection between any knowledge or suspicion of risk that the defendants may have had and the injury that the children actually suffered. Here, the plaintiffs presented evidence regarding various conditions in the White and Hill homes, including overcrowding and the dangerous placement of cleaning supplies. They also present evidence showing that the homes were not properly licensed at all relevant times. However, we are not persuaded that a reasonable jury could find that knowledge of these problems would have suggested to the defendants that Mr. White and Mr. Hill were likely to sexually abuse their foster children. Absent evidence establishing a strong connection between the presence of these

conditions and a risk of child abuse, these allegations are unable to satisfy the plaintiffs' burden of proof.

Our decision in *Kitzman-Kelley v. Warner*, 203 F.3d 454 (7th Cir. 2000) addresses the importance that an adequate link exist between the danger known to state officials and the alleged harm suffered by the plaintiff in cases falling within the "special relationship" exception to the *DeShaney* doctrine, as does this case. In *Kitzman-Kelley*, a DCFS intern subjected a seven-year-old foster child to a pattern of sexual abuse. It was alleged that the DCFS defendants violated the child's due process rights by failing to provide adequate screening, training and supervision of the intern. We found that the deliberate indifference standard could not be met by merely showing that hiring officials engaged in less than careful scrutiny of the applicant resulting in a generalized risk of harm, but rather the standard "require[d] a strong connection between the background of the particular applicant and the specific constitutional violation alleged." *Kitzman-Kelley*, 203 F.3d at 459 (citations omitted). Accordingly, proving a general risk of minor dangers is insufficient to warrant liability. It must be shown that there were known or suspected risks of child abuse or serious neglect in particular.

The strongest evidence that the plaintiffs put forward connecting the foster homes to sexual abuse are the two previous allegations of abuse in Mr. Hill's record. Aside from clear evidence of intent, we cannot think of a stronger indication that a foster parent is a probable child abuser than a past record of abuse. But in this case both reports reflect that after DCFS investigation the allegations were determined to be unfounded. Knowing what we do now, it is difficult not to question the accuracy or even the thoroughness of these investigations. However, neither those investigations nor their investigators are currently before the court. In a large state agency like DCFS, it is imperative that labor be divided and that employees be able to rely on

the determinations of their colleagues. Absent awareness that these internal investigations were a sham, a reasonable jury could not find that a defendant's knowledge of these reports was equal to knowledge or suspicion that Mr. Hill was a probable child molester.

Ideally, given the severity of the potential harm to children, the strictest precautions should be employed in making foster care placements. Indeed, one could argue that any accusation that an individual abused a child, whether fully established or not, should presumptively disqualify him or her from serving as a foster parent. However, the demands of the placement process may restrict such an approach with the limited number of appropriate foster parents and occasional false accusations of abuse. Against this backdrop, we cannot conclude in this case that the placement of a child with an individual who had two past accusations of child abuse that were investigated and determined to be unfounded warrants imposing liability on these defendants. As *Lewis* found with regard to a single past incident of a foster parent slapping a child, "[w]hile [it] may raise a red flag, it does not immediately become a 'suspicion' of child abuse." 308 F.3d at 774. *See also, S.S. v. McMullen*, 225 F.3d 960 (8th Cir. 2000) (en banc) (finding defendants' knowledge insufficient to impose liability despite their awareness that the father with whom the plaintiff child was placed 1) associated with a convicted child molester and 2) underwent a psychological evaluation finding him likely to endanger the child's welfare).

Even if these reports were sufficient to give rise to knowledge or suspicion of child abuse, the plaintiffs present no evidence that any of the defendants were actually aware of them. As previously discussed, there is no liability under § 1983 for what a defendant "should have known," *Pacelli v. deVito*, 972 F.2d 871, 876 (7th Cir. 1992), nor is there an affirmative duty of inquiry on the defendants' part to learn disqualifying information. *See Lewis*, 308 F.3d at 773.

The only defendants with any casework responsibilities were Remington and Crowther and, arguably, their supervisor, Soto. The remaining defendants—Johnson, Morgan, Horstman, Denton and Lewis—exercised higher level management roles. The plaintiffs have presented no evidence that any of the defendants involved in child welfare functions—either directly or in a supervisory capacity—personally participated in the challenged placement decisions. It is undisputed that J.H. and J.D. were placed in the White and Hill homes after Remington was no longer their assigned DCFS caseworker, and before Crowther became their assigned DCFS caseworker. It is further undisputed that placements in individual McKinley homes were selected by McKinley's staff. There is no evidence that any of the defendants were actually aware of the reports that Mr. Hill had been accused of sexually abusing children in his care. Furthermore, it is unclear which, if any, of the defendants knew the details of the McKinley investigation in general and the violations of licensing standards in the White and Hill homes in particular. While it is true that the state cannot avoid its responsibilities to the children in its care by merely delegating custodial responsibility to irresponsible private parties, *see K.H.*, 914 F.2d at 851-52, liability will only arise if the state actor knows or suspects that the agency or foster parents with whom a child is placed are likely to abuse the child. *See Lewis*, 308 F.3d at 773-76; *K.H.*, 914 F.2d at 852-54.

The plaintiffs also cite a number of disturbing statistics regarding the level of abuse within the DCFS system. These general allegations of systemic risk are insufficient to bring this case to a jury. Just as it is necessary for the known risk to be of a particular type (in this case, abuse or serious neglect), it is also necessary that the risk come from a particular source (in this case, the White and Hill homes). While the statistics may show that children in the foster care system are at greater risk of becoming victims of sexual

abuse than other children, they do not demonstrate that the defendants knew or suspected the likelihood that these particular homes would generate abuse. One could imagine a truly nightmarish foster care system where any child placed in it would be at a serious risk of becoming the victim of abuse. Notwithstanding the disturbing nature of the statistics that the plaintiffs put forward, one cannot rationally conclude from them that DCFS or McKinley were running such a system at the relevant time.

Finally, the plaintiffs' arguments regarding evidentiary and legal errors made by the district court are immaterial as we examine grants of summary judgment *de novo*. We find that the plaintiffs' remaining arguments, including their property-right-based argument, lack merit.

In sum, the plaintiffs have not put forth any evidence that these defendants knew of or suspected that J.D. and J.H. were at risk of sexual abuse in the White and Hill homes. The miscellaneous licensing problems in these homes pointed to by the plaintiffs are too general in nature to raise a question regarding whether the named child welfare workers knew of the terrible dangers lurking within. Although a closer call, the reports of previous accusations of abuse in the Hill home are similarly insufficient to have alerted the defendants to the likelihood of abuse given that they were investigated and determined to be unfounded. Moreover, the plaintiffs' case as a whole fails for a lack of evidence demonstrating that each individual defendant had personal awareness of the circumstances surrounding the White and Hill homes.

## III.  Conclusion

As regrettable as the decisions to allow the Whites and the Hills to serve as foster parents may have been, the plaintiffs have not shown that any of the defendants vio-

lated any constitutional rights of J.H. and J.D. That being the case, the district court appropriately granted summary judgment in favor of the eight defendants named in this § 1983 suit. The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*