# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3290

NAHQUASEH B. WAUBANASCUM,

*Plaintiff-Appellee,*

v.

SHAWANO COUNTY,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-111—**Thomas J. Curran**, *Judge.*

———————

ARGUED JANUARY 20, 2005—DECIDED AUGUST 1, 2005

———————

Before FLAUM, *Chief Judge*, and BAUER and KANNE,
*Circuit Judges.*

KANNE, *Circuit Judge.* Nahquaseh Waubanascum was
placed into foster care in the Shawano County, Wisconsin,
home of Mark Fry. Tragically, Waubanascum suffered
sexual abuse at Fry's hands. Waubanascum brought a 42
U.S.C. § 1983 claim against Shawano County, alleging that
the county deprived him of substantive due process when it
issued a "courtesy" foster care license to Fry. A jury re-
turned a verdict in Waubanascum's favor, and the district
court entered judgment thereon against the county. We
conclude, however, that Shawano County owed no constitu-

tional duty to Waubanascum and thus is entitled to judgment as a matter of law. Accordingly, we vacate the judgment of the district court and direct that judgment be entered in Shawano County's favor on remand.

## I.  Background

A tragic series of circumstances brought Nahquaseh Waubanascum into the vile clutches of Mark Fry. Waubanascum was raised by his grandparents on the Menominee Indian Reservation in Wisconsin. Waubanascum had a troubled childhood. In 1995, when Waubanascum was around fifteen years old, he stole a car and went for a joyride. Menominee County subsequently took legal custody of Waubanascum, removed him from his grandparents' home, and deposited him in a series of group homes for boys.

At the time, Fry was the principal at the Menominee Indian Junior/Senior High School. Fry befriended Waubanascum and visited him in the group homes for a time. Eventually, Fry suggested that Waubanascum come to live as a foster child in his home, and Waubanascum agreed. One wrinkle was that Fry's home was located not in Menominee County, which had custody of Waubanascum, but just across the line in neighboring Shawano County. Accordingly, Fry submitted his foster care application to Menominee County, not Shawano County.

Menominee County processed Fry's foster application in accordance with its standard procedure. As with all such applications, the process was lengthy and detailed. Among other things, the county constructed a foster home study, which involved several home visits to evaluate the physical condition of Fry's home. The process also entailed a number of interviews to determine whether Fry would be a suitable foster parent. The interviews evaluated Fry's views on various topics, including parenting, education, and supervi-

sion. A Menominee County representative met with Fry at least three times for a total of eight to ten hours.

The resulting home study described Fry's residence, his family history, and his educational and work background, which included ten years of prior teaching experience in Illinois. The home study concluded that Fry was "a very intelligent and caring individual" whose "desire to help seems very genuine." In short, the study concluded that Fry met the state standards governing licensure of foster homes and that he was a good candidate for a license.

Menominee County also contacted two of Fry's personal references, who offered no information that raised any red flags. In addition, Fry gave written authorization for a criminal background check. The county arranged for the check in the same way it did with all of its foster care applications—it submitted a request to the Wisconsin Department of Justice ("DOJ") to undertake the task, which often requires six weeks to complete.

While Fry's criminal background check was proceeding, Menominee County reviewed all of the information it had gathered in Fry's case and concluded that he was an excellent candidate for a foster care license. Fry was well known in sparsely populated Menominee County. He was a licensed teacher, an experienced educator, and the principal of the local high school. One county social worker later described Fry as "very intelligent," "eager to assist," and "a valuable resource for kids who may . . . have educational issues." In short, Fry appeared to be an ideal foster parent, and at the time, the county had no reason to believe otherwise. Consequently Menominee County requested that Shawano County issue a foster care license to Fry. At the time of the request, Menominee County also informed Shawano County that it had initiated the criminal background check of Fry.

A request to issue a "courtesy" license of this sort was not uncommon; Shawano County had for years issued such licenses to Menominee County and other counties. Other Wisconsin counties did likewise. Shawano County's practice was to rely solely on the requesting county to conduct all background checks of the prospective licensee and to fulfill all of the requirements of relevant state law and regulations. The county had in the past issued licenses in cases like Fry's, in which the criminal background check was in progress but not yet completed.

Shawano County reviewed Fry's home study along with the other information pertaining to Fry's application that Menominee County provided. Persons reviewing Fry's file believed that a criminal background check had already been completed or was being handled by Menominee County, based on that county's earlier representation. On the basis of this belief, the positive information contained in the home study, and past positive experiences with courtesy licensing, Shawano County issued Fry a foster care license on August 21, 1995. Two months later, on October 16, Fry's criminal background check came back clean from Wisconsin's DOJ.

In September, Menominee County placed Waubanascum in Fry's home, although Menominee County kept legal custody over Waubanascum. In fact, under the terms of the license, Menominee County retained jurisdiction over, and responsibility for, the placement of any foster children in Fry's home. Regarding Waubanascum specifically, Menominee County continued to provide services to him and paid for his foster care placement with Fry. When it issued Fry's license, Shawano County did not know of Waubanascum or that he would be placed in Fry's home.

After placement, Waubanascum was monitored under Menominee County's "Intensive Supervision Program," the highest level of supervision by its social workers, which is

geared toward at-risk juveniles. Pursuant to the program, two certified social workers made face-to-face contact with Waubanascum seven days a week and with Fry and the school at least once a week. The social workers also visited Fry's home two to three times a week.

Not long after Waubanascum's foster care placement, disquieting information came to light about Fry. In October 1995, an Indian School student told someone at a hospital in Shawano County that Fry sexually abused him. The student described shopping for clothes with Fry, and then returning to Fry's home. The student drank some juice, became groggy, and went upstairs to nap. The student described "dreaming" that Fry had "messed" with him—that Fry rubbed his penis on the student's leg and fondled his genitals. Other evidence indicated that the student had been drugged and sexually assaulted.

Randall Giese, a Shawano County Sheriff's Deputy, investigated the allegations and informed the Menominee County Department of Social Services, which initiated its own investigation. Deputy Giese also informed an unnamed intake worker at Shawano County's Department of Social Services. Deputy Giese assured the worker that the child in question was safe and that he would continue the investigation. Deputy Giese later testified that he may have spoken with other Shawano County workers, as well.

In the wake of the allegations, Waubanascum's social workers questioned him without Fry present. Waubanascum, however, indicated that everything was fine and that he wished to remain in Fry's home. Menominee County considered removing Waubanascum from Fry's home, but decided not to on the basis of the results of its inquiry and the fact that Waubanascum was doing very well in terms of behavior, school attendance, and grades. The social workers became more vigilant in their supervision of Waubanascum's status, but believed that Waubanascum was not at risk.

All was not well at the Fry home, however. In December 1995, Waubanascum began to have trouble sleeping and "dreamed" of Fry fondling him and masturbating in his presence as he attempted to sleep. Over the course of several months, these "dreams" progressed to more disturbing events during Waubanascum's waking hours. Fry often contrived to sleep in the same bed with Waubanascum. Worse, Fry became increasingly and openly physical with Waubanascum, giving him "backrubs" that ultimately led to undisguised attempts to engage in various sex acts with Waubanascum. These encounters took place in Fry's home and in various hotel rooms during several cross-country trips.

In February 1996, Waubanascum informed one of the Menominee County social workers about these acts of sexual abuse. That same day, Menominee County removed Waubanascum from Fry's home. On April 30, 1996, Shawano County revoked Fry's foster care license, and Fry was arrested and later convicted for his crimes.

It was only after the removal of Waubanascum from Fry's home that Fry's unsavory past came to light. Fry had been a history teacher for ten years in Illinois. In his off hours, however, Fry engaged in very disturbing behavior. In one bizarre instance, Fry was discovered at night on the roof of the home of one of his male students trying to peer into a window. Even more bizarre, Fry was dressed in black "ninja-style" attire, wearing a mask, and toting binoculars, a flashlight, and a canister of mace. Another student reported that he had spotted a similarly attired prowler in his backyard at night on more than ten occasions.

A person matching this description was also discovered attempting to enter the bedroom window of a sleeping student. After pursuing the person on foot, the student was able to identify the person as Mark Fry. These acts garnered considerable public attention in Northbrook, Illinois,

where Fry lived. Local authorities eventually arrested Fry in 1991 and charged him with attempted burglary and disorderly conduct. He was later convicted of misdemeanor disorderly conduct. Following these events, Fry moved to Wisconsin, where, amazingly, he was licensed as a teacher and hired as a high school principal in Menominee County.

Unfortunately, Fry's criminal past and history of bizarre behavior did not come to light when Menominee County processed Fry's foster care application. It was later discovered that when the Wisconsin DOJ performed its criminal background check of Fry, it limited its inquiry to reported criminal activity within Wisconsin, not elsewhere. This oversight, combined with the other unfortunate occurrences recounted above, resulted in Waubanascum being placed in Fry's home.

On January 30, 2001, Waubanascum filed suit in federal court against Menominee County, the Menominee Indian School District, and Shawano County. Waubanascum pursued his claims under 42 U.S.C. § 1983, alleging that each of the defendants violated his constitutional due process rights in issuing the foster care license and placing him in the foster care home with Fry. Waubanascum later settled his claims against Menominee County and the school district, and the district court entered an order dismissing those claims on February 18, 2004.

The case against Shawano County, however, proceeded to trial. Following the presentation of Waubanascum's case, Shawano County filed a motion for judgment as a matter of law, which the district court denied. On May 13, 2004, the jury returned a special verdict in favor of Waubanascum and against the county, and the court entered judgment in the amount of $175,000, plus almost $70,000 in costs and fees. Shawano County filed another motion for judgment as a matter of law or, in the alternative, a new trial. The court denied this motion, and the county appealed.

## II. Discussion

We review a denial of a motion for judgment as a matter of law *de novo*, viewing all the evidence in the light most favorable to the nonmovant. *See Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir. 2004); *DeBiasio v. Ill. Cent. R.R.*, 52 F.3d 678, 682 (7th Cir. 1995). Pursuant to Rule 50, judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue . . . ." Fed. R. Civ. P. 50(a)(1). We examine the record as a whole to determine whether there was sufficient evidence from which a reasonable jury could have returned the verdict, *Marshall v. Teske*, 284 F.3d 765, 770 (7th Cir. 2002), but we may not reweigh this evidence nor substitute our own credibility determinations for that of the jury. *See Gower*, 377 F.3d at 666. If reasonable persons could not find that the evidence justifies a decision for a party on an essential element of its claim, the court should grant judgment as a matter of law. *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 343 (7th Cir. 1995).

It is important to keep in mind what this case is *not* about. Despite the lengthy recitation in the facts of the unfortunate miscues that led to Waubanascum's abuse, this case is not a state law tort action against Shawano County. This is a case alleging deprivation of due process rights secured under the federal constitution. Waubanascum's claims arise under 42 U.S.C. § 1983, which requires a plaintiff to show that (1) the defendant deprived him of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law. *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003). The second requirement is not disputed in this case. As to the first, the jury agreed with Waubanascum's contention that Shawano County violated his Fourteenth Amendment due process rights. Specifically, the jury found that Shawano County had a policy or custom of issuing courtesy foster

care licenses, and that the county acted with deliberate indifference to Waubanascum's constitutional rights when it issued Fry's courtesy foster care license in the first place and failed to monitor the license thereafter.

The Supreme Court has made it very clear that a state ordinarily has no constitutional duty to protect private citizens from doing harm to each other, so the state's failure to protect an individual from private injury does not violate that individual's due process rights. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). "[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202. Even so, the Due Process Clause imposes such a duty when "state action creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been." *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002) (internal quotation and citation omitted). Accordingly, we have recognized two exceptions to *DeShaney*'s general rule. *See Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998) (citations omitted). One exception arises when the state has established a "special relationship" with an individual—if the state has custody of the individual, for example. *See id.* The other exception comes about when the state "affirmatively places a particular individual in a position of danger the individual would not have otherwise faced." *Id.* at 516 (citations omitted); *see also Lewis*, 308 F.3d at 773.

### A. Special relationship exception

In the foster care context, we have recognized that a child has a constitutional right to be placed into a safe and secure foster home. Specifically, we have recognized that state actors are liable only if they violated "the right of a child in

state custody not to be handed over by state officers to a foster parent or other custodian . . . *whom the state knows or suspects to be a child abuser.*" *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990) (emphasis in original); *cf. DeShaney*, 489 U.S. at 201 n.9.

For there to be a constitutional duty, the state must have *custody* over the child, or it cannot be liable under the special relationship exception to *DeShaney. See Stevens v. Umsted*, 131 F.3d 697, 702 (7th Cir. 1997) (citing *DeShaney*, 489 U.S. at 200); *Hutchinson v. Spink*, 126 F.3d 895, 900 (7th Cir. 1997) ("[T]he State has a 'special relationship' with those it has taken into custody."). Under the facts presented, we do not see how a reasonable jury could find that Waubanascum satisfied this requirement at trial. As ample evidence indicates, and as Waubanascum concedes, Menominee County, not Shawano County, had custody over Waubanascum. Waubanascum lived in Menominee County and attended school there. Menominee County took him from his grandparents' custody after his involvement in petty crime. It processed Fry's foster care application. It investigated Fry's background and suitability to be a foster parent. It requested the criminal background check from the Wisconsin DOJ. It requested that Shawano County issue the foster care license (and the license specified that Menominee County would place children in Fry's home and maintain jurisdiction and custody over them). It monitored Waubanascum under its highest level of supervision during the time he was placed in Fry's home. It investigated the allegations of abuse lodged against Fry by the unnamed student. And, it ultimately removed Waubanascum from Fry's home when Waubanascum reported the sexual abuse to Menominee County case workers. In short, Menominee County unambiguously exercised custody over Waubanascum in every respect except two: Fry's home happened to be in Shawano County, and Shawano County granted the courtesy license that allowed Waubanascum to be placed in Fry's home.

Waubanascum attempts to sidestep the unambiguous custody requirement by contending that Shawano County's "special relationship" with Waubanascum arose *because* it issued the courtesy foster license; had it not done so, Waubanascum never would have been placed with Fry to begin with. Waubanascum argues that Wisconsin laws and regulations set forth numerous requirements regarding foster licensing, thus indicating that Shawano County had a constitutional duty to him. He further argues that the county violated this duty by its policy of issuing courtesy licenses without undertaking its own background investigations, which exhibited "deliberate indifference" to Waubanascum's right to be placed in a safe foster home.

As to Shawano County's "policy," the evidence indicates that Shawano County issued courtesy foster licenses over the years under circumstances similar to those in Waubanascum's case—it relied on the requesting county to process the applications, conduct investigations, and initiate background checks. It is less clear whether Shawano County's practice in fact complied with Wisconsin law in effect at the time. The jury apparently believed that it did not, which is not surprising, given the extensive testimony to that effect at trial. But this fact is irrelevant in determining whether Shawano County's actions created a constitutional duty to Waubanascum, let alone whether it violated that duty. That state laws required Shawano County to perform its own background checks is not sufficient to create a "special relationship" that qualifies as a *DeShaney* exception. State law does not create duties under the federal constitution, and violations of state law are by themselves insufficient to impose liability under § 1983. *See, e.g.*, *J.H.*, 346 F.3d at 793 (collecting authority). If Shawano County's failure to conduct a separate background check was contrary to state law, such "dereliction of statutory duties should be of concern to . . . the [s]tate of [Wisconsin], [but] do[es] not form the basis of a § 1983 claim." *Id.* (citation omitted).

But even if Shawano County may somehow be understood to have had "custody" over Waubanascum by virtue of having issued a foster care license to Fry, this would not end the inquiry. Shawano County must also have exhibited deliberate indifference. In the foster care context, we apply a "modified" deliberate indifference standard. *Id.* at 792. Under this standard, the state must have actual knowledge or suspicion of the risk of harm the child may suffer while in foster care. As we noted in *K.H.*, "[t]he only right in question . . . is the right of a child in state custody not to be handed over by state officers to a foster parent . . . *whom the state knows or suspects to be a child abuser*. Only in this case thus narrowly described can the foster parent be fairly considered an instrument of the state for child abuse." *K.H.*, 914 F.2d at 852 (emphasis in original); *see also J.H.*, 346 F.3d at 795 ("[L]iability will only arise if the state actor knows or suspects that the agency or foster parents with whom a child is placed are likely to abuse the child."); *Camp v. Gregory*, 67 F.3d 1286, 1293 (7th Cir. 1995) (reiterating *K.H.*'s knowledge or suspicion requirement) (collecting authority).

Waubanascum suggests that Shawano County showed deliberate indifference by its "long-standing custom of granting courtesy licenses without conducting investigations of the applicants." Thus, he argues, "Shawano County's policy was deliberately indifferent to a known risk to foster children." Waubanascum seems to propose that state laws and regulations assume that failure to perform background checks necessarily will expose foster children to risk, thus constituting deliberate indifference. This argument misstates the legal standard, because it sidesteps the requirement that there be knowledge or suspicion of actual risk and substitutes the possibility of risk arising from the county's custom. Undoubtedly, foster children would be exposed to a heightened degree of risk if foster license applicants were subjected to no background checks at all.

We may assume that it is this very concern that underlies Wisconsin's laws and regulations requiring such background checks before a foster license may be granted.

But a failure to abide by a general statutory requirement for background checks cannot substitute for the requirement of actual knowledge or suspicion in the foster home context. *See J.H.*, 346 F.3d at 793 ("[C]onstructive or statutorily-implied knowledge cannot serve as a substitute for actual knowledge or suspicion."). As noted, it is unclear that Shawano County actually did violate Wisconsin law in effect at the time that the county granted Fry the courtesy foster license. But in any event, state law does not create a duty under the federal constitution, so even if Shawano County failed to abide by Wisconsin law, this would not by itself amount to a violation of Waubanascum's due process rights. *See id.*

No evidence presented at trial indicated that Shawano County knew or even suspected that Fry had a criminal past or would be likely to abuse Waubanascum. Indeed, to the contrary, all of the information and findings that Menominee County made in processing Fry's application (and passed on to Shawano County when it requested a courtesy license) indicated that Fry would make an ideal foster parent. Shawano County witnesses testified that they, too, believed Fry would make an excellent candidate on the basis of that information.

But even if Shawano County should have performed its own background check or otherwise duplicated the work of Menominee County, it is far from clear that the situation would have ended any differently. The evidence at trial indicated that Fry's background check, which was performed by Wisconsin's DOJ, came back clean. No evidence indicated that Menominee County did anything wrong when it requested that the state perform the background check, nor did any evidence show that Shawano County would have

gone beyond what Menominee County did in requesting the check. Likewise, it is unclear that the result would have been any different if Shawano County had waited for the return of the clean background check from Wisconsin's DOJ before issuing the foster license. Of course, with the clarity of hindsight, we now know that the criminal background check conducted by the state was inadequate because it excluded a check of criminal convictions outside Wisconsin that would have turned up details of Fry's checkered past in Illinois. But this oversight at most amounts to some species of negligence on the part of Wisconsin's DOJ and, even if it could be laid at the feet of Shawano County, cannot establish the county's liability. *See Lewis*, 308 F.3d at 773 ("Negligence or even gross negligence does not suffice to give rise to liability under § 1983) (citations omitted); *c.f. Kitzman-Kelley v. Warner*, 203 F.3d 454, 462 (7th Cir. 2000) (Posner, C.J., dissenting) (noting that it would be a "fundamental misconception" to conclude "that negligence and deliberate indifference are the same thing").

We have applied the modified deliberate indifference standard to dispose of analogous arguments in cases with similarly tragic facts. In *Lewis*, foster children were placed into an abusive home, and they later sued the state defendants under § 1983. *Lewis*, 308 F.3d at 770. The defendants licensed the foster parents after receiving mostly positive information in the course of their investigation, but also some information that hinted that the applicants might be unfit. *Id.* at 774-75. We reaffirmed the *K.H.* modified deliberate indifference standard and held that the state defendants were entitled to summary judgment. *Id.* at 775-76. We concluded that the state workers may well have been negligent in performing their background investigation, but they were never alerted to actual abuse or the likelihood of it. *Id.* Thus, the defendants could not be held liable under § 1983. *See id.* at 773 (stating that, pursuant to *K.H.*, the defendants could not "be held liable on the

basis of facts they did not actually know or suspect, even if they might have learned about disqualifying information if they had conducted a more thorough inquiry").

In *J.H.*, the plaintiffs were sexually abused in foster homes selected by a licensed private welfare agency under contract with the Illinois Department of Children and Family Services. *J.H.*, 346 F.3d at 789. The plaintiffs sued several employees of the latter department under § 1983. *Id.* The plaintiffs made an argument similar to Waubanascum's—that the defendants "knew" of the risk of abuse because Illinois law imposed various statutory duties on the state workers regarding licensing of foster homes, and the workers could not delegate its statutory supervisory duties to the contracted agency. *Id.* at 793. We held, however, that the defendants were entitled to summary judgment. *Id.* at 796. There was no evidence that the defendants knew of or suspected abuse, and such knowledge could not be imputed from a statute, nor could "statutorily-implied" knowledge serve as a substitute for *K.H.*'s requirement of actual knowledge or suspicion. *Id.* at 795-96.

Though the sad facts of this case are not precisely analogous to those in *K.H.*, *J.H.*, or *Lewis*, the same legal principles apply. There was no evidence presented at trial that Shawano County had actual knowledge, or even suspicion, that Waubanascum (or any child) would be at risk in Fry's home. Therefore, under the appropriate legal standard, the jury could not have found Shawano County deliberately indifferent to Waubanascum's rights. We conclude that no special relationship existed between Shawano County and Waubanascum, and therefore the county had no constitutional duty to Waubanascum on that basis.

## B. *State-created danger exception*

Waubanascum also invokes the second exception to *DeShaney*, under which the state may be liable when it

"affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Monfils*, 165 F.3d at 516 (quotation and citation omitted). Waubanascum argues that Shawano County, by issuing the license to Fry, "committed an affirmative act that placed Waubanascum in a position of danger that he would not have faced, and subsequently had an opportunity to protect him from that danger." In essence, Waubanascum simply repeats the claim we disposed of above: that Shawano County never should have issued the courtesy license to begin with. Waubanascum also, however, takes issue with Shawano County's actions (or inactions) following the issuance of the license. In particular, Waubanascum contends that the county failed to respond to the sexual assault allegations against Fry leveled by the unnamed student in October 1995. According to Waubanascum, the county knew of these allegations because Deputy Giese notified an unnamed intake worker for the county's department of social services and possibly others in that organization. He also proposes that the county is on the hook "regardless of whether or not Shawano County officials placed the child with its licensee, or knew the specific identity of the child placed in his home."

Although Waubanascum contends otherwise, we find the facts of this case to be very similar to those in *Ruiz v. McDonnell*, 299 F.3d 1173 (10th Cir. 2002). In *Ruiz*, the plaintiff's son died while in a licensed day care facility. The plaintiff brought a § 1983 action against the director and various workers of Colorado's Department of Human Services, alleging that her case fell within the "danger creation" exception. *Id.* at 1182. As the Tenth Circuit noted, "the crux of Ms. Ruiz's claim is that [her son] suffered injuries of constitutional proportions because the State Defendants improperly licensed Tender Heart [Day Care] after failing to conduct an investigation into the facility." *Id.* at 1183.

The Tenth Circuit affirmed the dismissal of the plaintiff's complaint, concluding that the act of granting a license did not impose an immediate risk of harm. *Id.* In addition, the court found it dispositive that the licensure "affected the public at large" and did not target specifically the plaintiff or her child. *See id.* In sum, the court concluded that the plaintiff "failed to allege any affirmative conduct on the part of the State Defendants that created or increased the danger to [the child,]" and therefore failed to state a viable § 1983 claim. *Id.*

We find this reasoning persuasive and applicable in the present case. The evidence at trial revealed that Shawano County did not know who specifically would be placed into Fry's home. Similar to the *Ruiz* court's conclusion, the only conceivable danger created by Shawano County's licensing of Fry would be to the public as a whole (all children eligible to be placed in Fry's home), because the licensure was not "aimed" at Waubanascum specifically. *Cf. Ruiz*, 299 F.3d at 1183 ("Unlike the direct placement of a child into an abusive home, the mere licensure of [the day care facility] was not an act directed at [the child], which, in and of itself placed [the child] in danger."). The evidence clearly established that it was Menominee County, not Shawano County, that placed Waubanascum in Fry's home (in fact, the terms of the license unambiguously indicated that Menominee County would have responsibility for placement of any foster children in the home). Therefore, the evidence did not support the conclusion that Shawano County affirmatively placed Waubanascum into harm's way when it did not even know of Waubanascum's existence at the time it issued the license to Fry. *See Monfils*, 165 F.3d at 516; *accord Ruiz*, 299 F.3d at 1183.

For similar reasons, Shawano County's failure to act in the wake of the October 1995 accusations does not satisfy the state-created danger exception. Waubanascum asserts that Shawano County was responsible for "monitoring

[Fry's] license" and was on notice of the October 1995 allegations, so the county should have removed Waubanascum from Fry's home.

We think Waubanascum reads the danger exception and the evidence too broadly. No evidence indicates that Shawano County was required to "monitor" Fry's license. In fact, as discussed above, the evidence revealed the contrary—Menominee County retained legal custody of Waubanascum and continued to monitor his status in Fry's home under its highest level of supervision, even though Fry's home was located across the Shawano County line.

Regarding the county's notice that Waubanascum may be in danger, the evidence is unclear whether Deputy Giese informed only a low-level intake worker, or additional Shawano County employees as well, of the October 1995 abuse allegations. It is clear, however, that there was no definitive evidence from which the jury could conclude that someone with decision- or policymaking authority at Shawano County received word of the allegations (indeed, the director and deputy director of Shawano County's Department of Social Services both testified that they did not receive word of the allegations until April 1996, after Waubanascum reported Fry's abuse). Nevertheless, the distinction is irrelevant.

Evidence at trial showed that Deputy Giese undertook a criminal inquiry of the matter, which was certainly appropriate. Consistent with his concern for the well-being of foster children that may have been in Fry's custody, the deputy informed Menominee County, which then conducted its own investigation of the allegations and took special steps to question Waubanascum outside the presence of Fry. Even if we assume that responsible persons at Shawano County knew of the allegations and failed to act despite the fact that Menominee County was pursuing its own investigation, this would be insufficient to trigger the

exception. As we observed in *Stevens*, "[i]naction by the state in the face of a known danger is not enough to trigger the obligation [to protect private citizens from each other]." *Stevens*, 131 F.3d at 705 (quotation and citation omitted); *see also DeShaney*, 489 U.S. at 203 ("The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."). Similarly, the evidence introduced in this case is insufficient to satisfy the state-created danger exception to *DeShaney*, and Waubanascum points us to no authority to support a contrary conclusion.

We remain mindful that "[a]ttacking a jury verdict is a hard row to hoe[,]" particularly in a tragic case like this one. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999). The evidence before the jury certainly revealed a number of missteps and dropped balls leading to the tragic outcome of this case. But we are equally mindful of the Supreme Court's caution against making "the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the states." *Paul v. Davis*, 424 U.S. 693, 701 (1976). As we have already noted, mere negligence does not provide a basis for liability under § 1983, *see Lewis*, 308 F.3d at 773, nor does a violation of state law. *See J.H.*, 346 F.3d at 793. To recover under § 1983, Waubanascum had to show that the county's actions deprived him of some right to which he is entitled under the federal constitution. He has not done so. An exhaustive review of the record and the trial evidence in the light most favorable to Waubanascum reveals at most negligence or some violation of state law on Shawano County's part. Absent from this evidence are facts supporting the conclusion that Shawano County owed Waubanascum a constitutional duty as defined under controlling caselaw, let alone that the county violated that duty. In sum, the evidence presented to the jury was insufficient to demonstrate that Shawano County deprived

Waubanascum of his due process rights, and thus there was not a legally sufficient basis for the jury's verdict.

Shawano County is entitled to judgment as a matter of law, and we need not reach the parties' remaining arguments.

### III.  Conclusion

Because the evidence introduced at trial was insufficient to demonstrate § 1983 liability on Shawano County's part, we REVERSE the district court's denial of Shawano County's motion for judgment as a matter of law, and VACATE the judgment of the district court entered on the jury's verdict. We REMAND the case to the district court and direct that judgment as a matter of law be entered in Shawano County's favor. The parties shall bear their own costs.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*